time. I'm going to try and reserve two minutes of my aid for rebuttal after his comments. In my limited amount of time I would like to address the trial issues. My client Maher Obagi received an unfair trial here for the three reasons set forth in our briefs and I'll try and address each one of those as concisely as possible. The first issue has to do with the funding issue for an educational psychologist who we sought to do testing on our client to objectively measure his English language abilities. This became critical at trial but I suspected in advance of trial that it would become an issue and then in trial it did become an issue. It became a critical issue in which the government repeatedly elicited testimony from lay opinion testimony from at least two if not three witnesses concerning Mr. Obagi's ability to speak and communicate in English. The issue had to do with false loan applications that were made by borrowers to get these loans in which income was inflated and there were other false representations on the applications. My client Maher Obagi signed one of those applications as did many other straw borrowers. This was very early on and there was an issue as to one whether he had actually ever read that application as many of the borrowers testified that he had not and then two whether even if he had read it whether he had understood what was being asked and the significance of that. The second issue which came up at trial that affected my client's English language skills was the testimony of Agent Matthews who along with Agent Campbell interviewed my client in January of 2012 at a Starbucks in which without a unrecorded without an interpreter and during that interview my client made various statements primarily relating to loan applications and acknowledging that the loan application bearing his signature contained false information. Now at trial Agent Matthews characterized this interview and my client's statements during this interview as a confession. On cross-examination however, Agent Matthews conceded that my client didn't say that he knew that these statements were false or that this document contained false statements at the time that he worked at Excel Investments. But Agent Matthews nonetheless testified that it was clear to him from the context of his questioning that that's in fact what he was saying. So what distinguishes this case then from any other case where an agent interviews a non-native English speaker? Nothing specifically, but the issue here is whether the expert requested would have shed additional light on this. Isn't the standard whether or not it's reasonably necessary? Whether a reasonable attorney would have retained this expert for a paying client. And I submit that in this situation knowing that my client is a recent immigrant, is a native Arabic speaker, and had the year he started at Excel gotten a D in his ESL course in language and grammar, I submit and knowing that there was going to be this and that the government was going to introduce my client's signed loan application, I think it would have been unreasonable for me not to have retained this expert. In fact, it would have been IEC for me not to try and retain this expert. If it was so necessary, why did you try to put this evidence in through other ways aside from the ESL transcript? There were no other ways, Your Honor. What we were asking for was an objective measurement. So the district court suggested that one, Mr. Obagi could have testified himself. And essentially, in order to exercise his right to put on a defense, have waived his right to not incriminate himself and remain silent. That's not a choice that any criminal offender can be forced to make. Or second, he could have put on his co-defendant brother in the case, which of course was not an option to him. Because his co-defendant brother also had the right, his Fifth Amendment privilege. And then third, the district court suggested that I somehow could testify or offer this evidence. There was simply no other evidence that any family member we might put on would have been accused for bias. What we were offering here and what we hope to offer at trial with this educational psychologist is an objective measurement based on scientifically recognized testing into English language skills that would have, if the testing bore out, would have shown that objectively, he lacked sufficient English language skills, such that his ability to communicate and understand what was being asked of him and communicate his state of particular clients in the past, would have been affected. Mr. Wilkie, this is Judge Molloy. And you had two hearings, I think on this question. Is that right? He did, Your Honor. So under the civil justice or the CJA provisions, could you have spent up to $800 to get your psychologist to present at least some preliminary evidence to the district court? No, Your Honor, we could not have because the $800 threshold before you need court approval is a threshold for all CJA expert vouchers. We had an investigator already in the case. We had a paralegal in the case. We had, at some point, a mortgage expert as well. We had far exceeded the $800 threshold at that point. I had to go to the court. Okay. All right. So then, what do you make of the reasons the judge denied? So he didn't want, he wanted to pay CJA lawyers more. He, I don't know, there was a series of things that didn't seem to have anything to do with the question of whether or not the request was reasonable. I agree, Your Honor, they didn't. And I am all for paying CJA lawyers more. But that was not a reason to deny my client the funding he needed to put on his defense. He did. The reasons were the limited resources that maybe the money could be better spent than he exactly gave us the CJA lawyers. The availability of lay witnesses, and I think I've addressed that point already in the three lay I'm not really sure what he meant by that. Because the type of analysis or testing we were going to go wouldn't really implicate Fifth Amendment concerns. We've only addressed my client's English language skills. Mr. Wilkie, let me jump in. Because I believe you said you wanted to address the Brady allegation as well. I do. It's the third of my three issues. I'm hoping to address all three of them. And I actually specifically want argument on that issue. Go ahead. And I know your time is running out, but I'm going to go ahead and let you go over time. But if you could kind of wrap up your first point about the language expert, and if you could go to the Brady argument, I would really appreciate that. Yeah, I will. I will jump to the Brady argument right now. The government's essential response is it's no harm, no foul, because the testimony of Haleem Saad. The problem with that argument and why Mr. Obagi was still prejudiced is because the undisclosed evidence. One, you can't really unring the bell with regard to Haleem Saad's testimony. She was a very important witness because she pushed criminal intent. She attributed criminal knowledge and intent to Meher Obagi at the outset of the scheme. That was her significance. And she substantially corroborated the testimony of the impeached witness, Jackie Burchell, who was the escrow agent who came in later. But Saad's fabricate, who put the criminal intent squarely on the shoulders of Meher Obagi at the outset of the scheme. That could not have been unrung by the court's instruction that they should disregard her testimony. I would also know this is... Go ahead. Yes, sir. Why wouldn't striking that testimony unring that bell? One, because it simply... That testimony in and of itself did not establish the element. It simply corroborated Jackie Burchell's testimony. Two, the court said should. And this court in the past has repeatedly viewed the term should as a permissive term, basically a jury. I think this evidence has problems because it may have implicated due process violations. The government didn't tell us these two things about it when actually there were about eight or ten... What about the written instructions that were compulsory? It was not compulsory. The written instruction was compulsory. It says shall. But the instruction given to the court at the time was should. And I think the case law from the Ninth Circuit is fairly clear that where there is this discrepancy between the oral and written instructions, the court's going to look to the oral instructions. Because frankly, this court has no basis for even determining whether the jury ever looked at the written instructions in the jury room. There's no evidence in the record that they ever even considered those. The only thing we know the jury heard was the oral instructions. Let me ask you this, because I was looking through the court's attempt to clean this up. And I think my biggest concern about this, and I'm going to telegraph this for Ms. Quinn, because Ms. Quinn, I definitely want you to talk about this, is that the way that Sodd was presented during the government's opening close was that the reason why you can trust Burchell, and the reason why, in a sense, you can trust all of these cooperators is because you have a few witnesses, Armstrong, Spinella, and Sodd. That's why you can trust them. Then obviously the whole thing happened with Sodd. And when I make this comment, I don't think there was any intentional misconduct by the government in this case. I just believe this was a big mess up, quite honestly, but nothing intentional. But that was said that you can trust Burchell because of Sodd. Looking through the court's instruction, I see that the court says you should not consider any arguments made by the government concerning Sodd. I see that there. But was there anything else that the jury about, well, remember when the government said you can trust Burchell? Well, that was wrong because, in fact, Sodd was a cooperator like everyone else. Was that distinction ever made to the jury? It was not, Your Honor. And in fact, during the conference on what kind of limiting instruction or curative instruction should be given, we actually asked the court to give an instruction that the jury could draw an adverse inference as to other witnesses based on this non-disclosure. The court denied that request. The government opposed that and the court denied it. So the jury, the government got the benefit of the cooperation of Burchell without, essentially, they were allowed to basically rest their laurels on that argument they had made throughout trial. That you can trust Khatib, you can trust Burchell because of these independent witnesses that were, in fact, not independent. The one other point here, Your Honor, is that this testimony, this undisclosed Brady information went beyond Sodd. It went to Khatib's credibility and specifically the prosecutor's own belief that Khatib was not credible. That came out in the post-trial hearing. And it also went to Agent Campbell's thoroughness of her investigation and her objectivity when she was put on notice of this information about Sodd and essentially took no action to find out any of this Brady information. We think that went to the thoroughness and objectivity of the investigation, which is a common defense form of impeachment, a common way the defense attacks a prosecution's case. It was not objective. It was not thorough. Yet, we weren't allowed to, this evidence would have supported that. We weren't allowed to present that. So you were not allowed to present that. The district court allowed you to re-argue based off of the curative instruction. And you could have argued the negative inference. And I don't understand why counsel didn't. Your Honor, because the evidence wasn't available to us at the time. At the time we were arguing and they were allowing us to re-argue, we knew two pages of Brady material that listed 10 things. We knew two that are reflected in the court's curative instruction. And this is set forth in our reply brief. But there were multiple other facts we learned when people actually read the undisclosed Brady material. And that was the evidence that showed us that Agent Brady had been tasked with as part of the government's investigation team. So we simply didn't know that at the time we were arguing. And I had already, in fact, this first came to light after I submitted my case to the jury. So I had already argued. It simply was not feasible to then break for two weeks while we reviewed 5,000 pages, 4,750 pages of materials to what end we wouldn't have known at that point. But you could have argued the adverse effects on the government, the sloppiness of their case based on what you knew at the time. Well, we asked the court for that instruction, which would have been more than we got. It would have certainly been helpful. Right. But why did you argue that point? I had already argued, Your Honor. I had already given my argument to the jury. Didn't the district court allow a re-argument? They offered us that option. I chose the option to have the court's instruction rather than re-open argument because it would have allowed, it also would have allowed the government to re-open argument as well. And I made the decision not to re-open argument. But I think the point is, and in fact, all I could have argued were the two points that we knew at the time. All those other points that are raised in our brief were not even known at the time. So, yes, did I make the argument in my closing that Heather Campbell and the government's investigation was not thorough and not objective? Yes, that was a major theme of our case. Would this evidence have supported it? Yes, it would have. I wasn't allowed to use this evidence to bolster a major theme of my defense. All right. Thank you very much, Mr. Wilkie. I did let you go over time, but I think it's an important issue. I want to make sure you covered it. Ms. Quinn, don't worry. If it looks like you need more time, we'll give it to you. OK. But now we'll go ahead and move on. I think Mr. Stewart, you're up next. Thank you, Your Honor. And using the baseball analogy, I'm a relief pitcher coming in for an inning. OK. On the comments that Mr. Wilkie just made, he and I tried this case and we had to make a lot of tactical decisions in a hurry. But one thing that was we had in common throughout was attacking the sloppiness of the government's case. And in my closing argument, I made four or five different points pointing out where the sloppiness had been. So it would have been enormously helpful to have been able to review all of that material and would have supported what was basically a very important theme in our defense. Other than that, Mr. Wilkie put it well and was the one that dealt with most of the instructions and that sort of thing. So I'm going to move briefly to the role in the offense of my client. I had asked the trial court for a two level adjustment downward for my client, arguing that his role was not essential. And another of a number of other arguments that are in my brief. But I just wanted to highlight a case that I cited at footnote for page nine of my brief, U.S. versus Gomez Valle, wherein the Fifth Circuit found that simply being paid to perform tasks should not be should be considered for a role adjustment downward. And that really was the heart of what I was arguing. One of the problems is that, like the last case that we discussed, the findings here as to the reasoning for the district court's denial of my request are thin or non-existent. In fact, there's actually a point during the judge's comments when I was concerned that he had confused my client with somebody else. It was an analysis of whether or not a blind mule was an analogous situation. And the trial court said something to the effect of, yes, a mule role may apply here, but I think it's much more serious when you're a straw buyer. And he was talking about my client at that point. And my client was not a straw buyer. He was an employee at Excel. And as I argued in the brief and the district court and anywhere anybody would listen to me, that's all he was as an employee. And I think beyond that, I'll go ahead and submit and allow Mr. Coleman to speak. Okay, Mr. Coleman, he's giving you a little extra time there so we can take the two and a half minutes that Mr. Stewart did not use and we can give them to Mr. Coleman and use them as you wish. I appreciate it, Judge Owens. Thank you. My hope was to just briefly talk about our closing argument claim and then move on to sentencing issues. On the closing argument claim, I think the government's strategy in this case, both below and on appeal, make this case a candidate for reversal under the plain error standard. The strategy below that I'm referring to is that this issue about whether my client confessed to this witness became the focal point of the government's closing argument. It was their primary point in the initial closing argument and it was their primary point in the rebuttal closing argument. So they made this a critical part of the case. The strategy that I'm referring to on appeal is that the government's position in their brief seems to be that this court's decision in Flores found no improper closing argument and that they just did what the prosecutor did in Flores. And therefore, there was no problem here. And I think when you look at the fourth prong of the plain error test, the government's refusal to acknowledge the boundaries that this court is setting for prosecutors and closing argument suggests that reversal under the plain error standard should apply here. Flores specifically found that the prosecutor's argument was improper, that they acted like the defendant had confessed when the defendant had not confessed. And that's the exact same problem that we have here. The witness made it clear that he couldn't say that the defendant confessed to him and the prosecutor pinned him down on that. Both the defense wanted the witness to say that Mr. Abadji was as surprised as he was about the fraud. The prosecution wanted the witness to say that, no, he wasn't surprised. He was confessing his knowing involvement in the fraud. And at the end of the day, the witness said, look, I can't say. I was so wrapped up in my own grief and my own problems that I can't tell you that he actually confessed. I can't tell you that he didn't know anything that was going on. But the prosecutor. Couldn't the prosecutor draw inferences from Mr. Shishab's testimony that it was, he said that it was fraud, a massive fraud. So why is that not a proper inference to draw that that that your client was confessing? I agree that if the prosecutor had made the inferential argument, if the prosecutor said you can infer from the fact that he knew some of these facts that he must have been involved in the fraud. But that's not what the prosecutor did. The prosecutor said he confessed to Shubash, that he confessed participating. And that's not, there's a big difference between the inferential argument and actually stating as a fact that the that the defendant confessed to a witness. And that was the point of Flores. It was also the point of Mageno, which I know it was ultimately the opinion was vacated because of developments in the record development in that case. But that is the essential, I think, point that this court's precedent has been making clear is that prosecutors can strike hard blows. They can make inferential arguments, but they can't misstate the testimony. And that's what they did in this case. If there are no other questions on that, I did want to move forward to the sentencing. In particular, I want to start off with the loss issue. We have a dispute about the standard of review. We're contending that the issue was adequately preserved below the government is arguing the plain error standard. And the defense clearly objected to the loss calculation in the district court. And we've cited a series of cases, Lloyd, Reyes, Waheed, Walton, and the list goes on, where particularly in the sentencing context, this court has said that if you make the objection, that's sufficient. You can make new arguments on appeal as long as the objection is made. And that is one of the reasons why this court has given that leeway, particularly in the sentencing context, is that if there is a reversal, it's not like you have to do an entirely new trial. All you're doing is saying, okay, let's have a remand for a resentencing. It's one hearing where the issues can be again, fleshed out more. So we believe that under this court's case law, the issue is preserved. It's not a plain error standard. And once you get past that, I believe the government has essentially conceded that their calculation, which was just over $10 million, included a variety of interest and other fees that should have been excluded under application note three. And that, and we went through and set forth at least about $775,000 worth of overage, and there was actually more, which would have brought the threshold below the $9.5 million that was required for the 20 level increase. So, you know, not, so if the plain error standard doesn't apply, I believe that their brief essentially is conceding that there was improper, I guess, fat in the loss calculation. And so at the very least, the court should remand on that issue. I also have a similar argument as to the aggravating role increase that my client received. The findings on that were insufficient. The, basically what the court said after hearing a very specific objection that my client did not have control or organizational authority over another participant, the district court just said, I'm going to give three instead of four. But the district court never resolved the objection that my client did not have control or authority over another participant in the offense. So we think that reversal for remand for resentencing on that ground should apply as well. The government has essentially asked this court to conduct its own de novo review and to determine that the role adjustment was proper. We don't think that that's appropriate for multiple reasons, including that the government is basically arguing new points that they didn't raise below. Some of the points they're raising, the court, the district court sort of rejected with respect to my client's brother in declining an aggravating role adjustment for my client's brother. So in this particular context, we don't think it would be appropriate for this court to conduct its own de novo review and sustain the enhancement on the government's new arguments. If there are no other questions, I'll reserve my minimal amount of time. Okay, very well. I believe now we're on to Ms. Quinn. So Ms. Quinn, before you start, you've got a lot of issues in this case. I'll just kind of set forward. You've heard the issues that have been argued so far. I know, at least for me, I'm very interested in Brady issues, so make sure you use your time and address that at some point, okay? Of course, Your Honor. And can you hear me okay? I can. You may proceed. Thank you, Your Honor. May it please the court, Kerry Quinn for the United States. I am going to address, and actually I'll start with the Brady issue, since Your Honor has raised questions with that. But I will, of course, want to reserve some time or allocate some time to the issues that Defense Counsel, that Appellant's Counsel has, of course, raised. Of course. There's no question and no dispute that the government did not timely disclose the impeachment information concerning the witness, Holly Sodd. The only question now is, for this court, whether the district court abused its discretion in the remedy that it chose for that late disclosure. And on this, I submit that the harsh instruction that it gave, criticizing both the government for failing to disclose evidence and completely striking the witness's testimony and all government arguments based on it, was an adequate remedy to ensure that these defendants did a fair trial. And I think the instruction did address both aspects of the late disclosure issue that the defendants are raising in this appeal and that they raised below. First, the witness's credibility, which in striking the witness's testimony, as well as advising the jury that she received immunity in another case and may have made false statements to the FBI, itself was a complete, very critical of the witness and her credibility. And then it also addressed the government's, the thoroughness of the government's investigation in telling the jury that the United States Attorney's Office and the FBI had failed to disclose evidence. And that was the last thing that the jury heard before they went to deliberate. It was after all of the arguments. It was the last thing that they heard. And they did. They deliberated for several days. And I do think that that instruction ensured that the defendants received a fair trial. I do think that. This is Judge Malloy, and I'm not so sure that instruction is as adamant as you say it is or that it really resolves the Brady problem, which I think is admitted because the court instructed she may have knowingly made false statements. She did make false statements. She perjured herself. And then it says, for these reasons, you should disregard the testimony of Saad, having that reason being the failure to disclose implicates. It didn't implicate, it violated the defendant's rights. So how can that instruction have remedied the obvious and admitted Brady abuse? Understood, Your Honor. And I take your points about the instruction wasn't exactly what the was a little bit less than what the defense had asked for. Respectfully, I don't think that despite the late disclosure issue, I don't think that the defendants due process rates were violated because, as Your Honor's know, to have a true Brady violation, you need not only to have the evidence to be to be favorable. So the accused and not disclose, but you also need materiality. And this was not a key witness. This was not the government star witness, despite the defendants obviously trying to characterize that it that way. This was a corroborating witness, all of whose testimony was duplicative of other witnesses. Hold on, I know it's tough to interrupt someone on Zoom, but I'm going to do it anyway. Um, look, she may not have been the A plus witness, but in looking at the closing and again, when I make these comments, I'm not suggesting that the A was made that made the argument had anything sinister going on. I want to be clear about it. This is just a big mess up, as I said before. But during the closing, the prosecutor on several occasions said, look, the reason why you can trust these dirty witnesses is because Saad is a clean witness. So it's not merely that Berchel and Saad, their testimony overlapped. It was that Saad put a gold star on Berchel. So can you deal with because I will tell you, that's what bothers me the most about about what happened here was that Saad was used as a bridge witness to say, look, you may not like these Berchel and other people because they've all signed cooperation agreements, but we can trust them. Why can we trust them? Because Saad doesn't have a cooperation agreement. Saad is a clean witness. And that wasn't true. Now, again, not because I wasn't saying this was not an intentional misstatement by the prosecution, but it wasn't true. So how can we say that Saad was just a throwaway witness when in closing, we can go through all the times that it was said about how in particular you heard from Ali Saad. They're corroborated from independent witnesses, Ali Saad. How do we how do we get around that? In this case, I understood your honor. She wasn't the only corroboration. And I think that is important because there was not only these other witnesses who did corroborate. You have all of the other evidence that shows that these this defendant and I'll talk about Mr. Obagi here. I think that the evidence against Mr. Slaw, the witness did mention Mr. Slaw. There was a lot of other evidence, including his taped admissions to a co-conspirator that he had forged all of the financial records. But with regard to Mr. Obagi, he had he ran the fraudulent loan processing part of this fraud. And the evidence of that, I submit to you, independent of Ms. Saad was overwhelming. The corroboration independent of Ms. Saad. And, of course, my colleague would not have we wouldn't have called her at all, of course, as we didn't in the second trial. And we wouldn't have mentioned her in this way and known what we didn't know and what we found out. But the other evidence was, was overwhelming. This defendant, Maher Obagi, ran the fraudulent loan processing part of the fraud. There were three co-conspirators that testified to that and their testimony in the presence of Ms. Saad was corroborated by Ms. Armstrong, by Ms. Spinella, by all the documents. But let's take a break there. Armstrong testified, I think he said that he did not know about false report, correct? Ms. Armstrong didn't know about all, wasn't involved in the submission of any of the loan documents. So that's not another corroboration. Then you have Spinella. And it's my understanding Spinella testified about burner phones and acting like an old person on the phone. But those don't go to the documents of Burchell either, do they? So Mr. Obagi participated in two aspects, two major aspects of this fraudulent loan scheme. The first of which was that he ran the all of the fraudulent loan processing part of it. He was the one who came up with all of the fake information to put in the fraudulent loan documents. And then as well as to supervising Mr. Then there was the second piece, which was the escrow process. And that's where Mr. Burchell comes in. That's where Ms. Saad comes in. And he also supervised that aspect of it as well. But Ms. Saad didn't talk anything about this fraudulent loan processing and Mr. Obagi running the point system, figuring out how much income needed to be fixed to put into that system. That's what Mr. El Tahir testified about. And Mr. El Tahir's testimony was corroborated by Ms. Spinella and Mr. Armstrong, that there was all these phones and that Mr. Obagi was pretending to be borrowers and employers to corroborate or to provide fake information to lenders when they would call to verify or try to verify back information. And none of that had to do with the escrow part of things. It also didn't have to do with the $892,000 that this defendant, along with his brother, took from the fraud that the bank records showed, over half a million of which, half a million dollars, was funneled through this defendant, Maher Obagi's bank accounts, and a quarter million of which was funneled through his bank accounts solely in relation to the kickbacks that he received from builders for his units alone. And I think one unit that was purchased by his uncle. But he's participating. And again, that has nothing to do with Ms. Saad or Ms. Virchel. That's the escrow piece of things. And admittedly, as your Honor said, this wasn't, of course, no one wanted this to happen. It wasn't ideal. We found out about it in the middle of trial. We immediately brought it to the attention of defense. We immediately brought it to the attention of the court and did everything possible we could to try to remedy the issue as soon as we discovered it. We then spent years in post-trial proceedings, and this district judge allowed hearings on the issue. And in the end, himself, having sat through this trial, as well as the second trial with his brother, concluded that the defendants had ultimately received a fair trial because the information, although it came out late, the jury was alerted to it, and that ultimately, this witness wasn't material to the outcome. And the district judge did go through hearings on this, numerous rounds of briefing, heard testimony from prosecutors and the case agents, and all of these arguments were made to the district court. And ultimately, although, of course, again, it's not ideal, I do believe these defendants did receive a fair trial. And the other corroborating evidence of this defendant's guilt can give your Honor's assurances that these defendants, again, did ultimately receive a fair trial. Let me ask you one last question, and then, unless anyone has any questions, you can certainly move on to the other issues. The question I asked Mr. Wilkie was, there was an impression made during the opening close that the reason why you can trust Burchell and these other witnesses was because you had clean witnesses, and Ms. Saad was listed as one of the clean witnesses, along with Armstrong and Spinella. As to Saad, was that misinformation ever specifically corrected in saying, I know we said before Saad corroborates Burchell because she was a clean witness, that was wrong, that shouldn't have been said? I think there you have, and this is something the government asked to be included in the court's instruction, the addition that, please ignore not just Saad's testimony, but all government's arguments based on it. And perhaps it could have been even more clearly stated, as your Honor is stating it now, but the gist of that, that you need not just to ignore this witness's testimony, but all government arguments based on it, again, was in fact conveyed to the jury. And I think as Judge Malloy or maybe Judge Bumate had pointed out, the district court did allow or just at least give the defense the opportunity if it wanted to re-argue the case to make these arguments that it could have, and the defense, undoubtedly for good reason, chose to have the last words come from the judge, and that of course is understandable. In any event, again, I submit again, although this wasn't a perfect trial for the reasons, particularly for the reasons of this Brady issue that came up in the middle of the trial, it was a fair trial, and the lessons learned from that trial are still being incorporated into the trainings the U.S. Attorney's Office does, into the trainings the FBI does, so that future cases, to the extent necessary, that this doesn't happen again. With respect to... I'm sorry, before you move on, what do you make of the argument that the district court only gave a permissive instruction to strike Ms. Todd's testimony? That should instead of shall, does that affect things? Your Honor, respectfully, I don't think so. I think it was very, very clear from the context of the statement, and there's many other instructions, standard instructions, including the ones that we pointed out, at least one we pointed out in our briefing, that used the word should, where it's clearly intended to be a mandatory shall, and as Your Honor also pointed out, actually written instructions that went back did actually use the word shall, but I think regardless, I think it was clear that the context and the way that the statement was read, and not everything the judge said, the district court judge said, and that instruction made clear, the jury was supposed to ignore this witness's statement's testimony and the government arguments based on it. With that, let me address, I think, because Mr. Wilkie obviously spent quite a bit of time on the CGA funding issue for the educational psychologist that he asked for a team, and on this, I believe on two points, that the defense in this case cannot establish either the necessity prong or the prejudice prong, and on the necessity, and Mr. Wilkie stated the standard correctly, that would a reasonably competent counsel retain this expert for a paying client, and that standard obviously was discussed in the district court, and actually the district court actually discussed it in the decisions that he, in the decision he issued, as well as the standard was discussed, in the arguments that were made in the two different hearings, and so although some of the musings about whether CGA funds could be spent better may not have been necessarily either the right way of saying things, or the appropriate considerations, I do think that the considerations, the factors that the district court judge considered, and the conclusion that he reached was within his discretion, that there was nothing unusual or unique about this case, that in fact, it was a case where the defendant didn't need an interpreter to understand the very same mortgage concepts that defense counsel said he needed an expert to evaluate defendant's English language understanding of, so we had a whole trial, almost a month long pre-trial, where the same mortgage concepts were discussed, and on this, I want to point out that although Mr. Wilkie on appeal has emphasized that there were two aspects of the expert that he needed, that he wanted to use, that wasn't the argument made to the district judge, and in evaluating the abuse of discretion standard, I think you have to look at what was in the application, what were the arguments made to the district judge as to the reasons why this expert was being sought, and other, and all of the written submissions, and all of the hearing, the first hearing that took place, and basically all of the second hearing, with an exception of one passing comment, all focused on what Mr. Wilkie described as technical aspects of mortgage documents, that he wasn't sure his client understood, and he wanted to make sure, because he thought some, you know, the whole trial might come down to whether his client understood technical aspects of those documents, and respectfully, the arguments that they're making on appeal about whether he understood the interview just simply were not presented to the district judge, regardless, I would say that, you know, again, that the factors the district court considered were appropriate, was this kind of expert a typical expert that, you know, a paying client or a routine counsel would obtain for a paying client, and as well, there were. One question I have is, was it in the record in what language Mr. Obagi spoke to either his co-conspirators or other employees at Excel? Yes, Your Honor, that was actually part of the trial, and it is in the record. He spoke to his co-conspirators, according to the co-conspirators testimony, mostly in Arabic. There were some, I think, mixed English and Arabic, but in Arabic, so that included Mr. Salat, included Mr. El-Zahir, and included Mr. Khatib, and his brother, and Mr. Obagi's brother. But he spoke to the co-conspirators who didn't speak Arabic, and obviously in English, so Ms. Birchall, and then the office workers, Ms. Armstrong, Ms. Spinella, all the other office workers only spoke English, and that is where there was testimony on the ability for defense counsel to develop, had he been able to develop, or wanted to try to develop, and there was some testimony on this to try to develop that maybe he just hadn't understood things, but respectfully, this goes to the prejudice prong. This wasn't that difficult or complicated a fraud. This was a fraud that involved literal cutting and pasting with scissors and tape of financial records, and large parts of that this defendant oversaw, as well as just Adobe, using Adobe software program to create phony W-2s and phony bank statements that this defendant sent to lenders. So again, you didn't need a very complicated or comprehensive understanding of English to know that there's something wrong with just inventing numbers, inventing companies, and then faking everything in a loan application and sending it off to lenders with phony backup. And I think I've already gone through, I think, all of the other evidence that showed that this defendant very much understood and knew and participated actively in this fraud, so I won't go over those here, but I think that goes to the prejudice prong. With my remaining couple of minutes, I do want to address the confession argument from the second trial that Mr. Coleman raised, and I'll deal with any of the sentencing issues your honors would like me to raise. Briefly, with respect to the confession argument, I do believe that this, that arguing that the defendant had confessed to Mr. Shubash was absolutely a fair inference from the facts that had been come out at trial, and I do think from the context of the argument, no one was saying, although actually this witness did say the word confession, so he had adopted as part of the redirect, the statement. And so this is when the defendant confessed to you, right, and he said yes, so, but even in terms of the reciting of the statements that the witness had said, those were always accurate to this jury, both in the opening close and in the rebuttal close, and it's clear from the context that this is an argument that's being made, not exactly quoting the, not exactly quoting the witness. But regardless, again, in terms of, to talk about prejudice, I mean, here, there's a plain error standard, the evidence against this defendant, again, very, very overwhelming, not only do you have the statements to Mr. Shubash, he also told investigators he was involved in conduct that was obviously fraudulent, he himself forged financial documents, you had an office worker, Yvette Cruz, who saw him with his scissors and tape over a copier, forging financial records, she also testified to how he pretended to be borrower's employers when lenders called, she recounted a specific instance where he had directed her in how to do this, and she remembered because she'd messed up the information, he negotiated the kickback agreements, he was a licensed broker who also recruited borrowers that he knew had no income or assets and knew no one was all going to be faked. So I think I've got 20 seconds to address the sentencing arguments. With respect to the loss argument, I don't think it's either plain error or de novo. I do think that the arguments below, the defense specifically disclaimed any issue with a loss, a loan by loan loss calculation. And so to now raise it on appeal, I do think this, of course, should apply plain error. But if it doesn't, at the very least, it should apply clear error. And I don't think that the loss calculation, that there's really much of an argument that the district court, having received probably thousands of pages of briefing and declarations and supporting documents and having multiple key hearings, that the loss amounts that it came up with were clearly erroneous. And this, even the backup, the backup loss calculation the government submitted, amply supports the loss calculation. Yes, counsel, why isn't the guidelines pretty clear that you're not supposed to take an interest of any kind? Yes, your honor, there is it. Obviously, there is a provision of that in the commentary. And I think here, I guess, although these make whole agreements, I guess the best way of phrasing it is really what was included here in terms of actual loss are basically contractual payments that had to be made. And what then comprised those contractual payments or what sort of made up those contractual payments, I think, is, I just, we wanted to be open and up front with the court that I do think that the counterparties to those indemnity agreements probably did, although I don't even know because this is not part of the record, but it may have included or they may have talked about those, about lost interest or some types of fees. And I don't even know what kind of fees, but attorney's fees. There may have been some portion of that. And I don't even know what part of the indemnity agreements would have included that. But I think that the way, for the purposes of 2B11 in the commentary, I think really the way that this court, to the extent you're getting into the details of the facts, which again, I think the plainer, clearer standard of review here somewhat precludes getting into. But if you do get into that, it's really, it was a contractual payment that ended up being made. And that's why it was included in loss. And I do think what 2B11, the commentary, and if you see the types of not just interest of any kind or fees or an agreed upon rate of return, it's trying to avoid getting into a sort of opportunity cost or a sort of expectancy interest and not have you tack on a bunch of stuff that wasn't an actual loss. And here we use a hard number of actual loss, money out the door. So I think that that's the Durham's position on the loss. And over time, I do think that the, just very quickly on the role enhancements and rule reductions, I do think that the record was replete with, just talking about the role enhancement for Mr. Abaji, the record was replete with testimony, with even arguments made at both sentencing hearings, both for Mr. Abaji and his younger brother Obaji, that Mr. Abaji had a supervisory role with respect to other culpable participants, including his brother, including his younger brother, including Mr. El-Tahir, including Mr. Salah. And regardless, he had, there's sort of, in this court's precedent, there's two ways of getting to rule enhancement. There's either authority over others or sort of organizational authority, and I think he had both. And I think in 10 seconds, I can address the rule reduction. I think all of the arguments that Mr. Stewart made very well to this court, he also made to the district court, and the district court just rejected them. And that he found that Mr. Salah, Mr. Stewart's client, did not have a minor or less culpable role in the fraud. And over time, I think that's- Could I ask one question? So, Ms. Quinn, I'm curious, just from reading the record here, it looks like Mr. Khatib was sort of the principal, big, top of the tier defendant, and the government agreed the loss with him was $6.2 million. Why aren't you cabined by that as it relates to all the other people? Understood, Your Honor. Mr. Khatib entered into an early plea agreement. He obviously got the benefit of that, as the losses hadn't all been experienced yet. And so at the time, the government's calculation was accurate. But I think it was 2012 when he entered into his plea agreement, and he wasn't sentenced. And none of the defendants were sentenced until, I think, 2018, if I'm not mistaken, maybe 2017. The years have passed. But I do think that the other defendants did get somewhat of the benefit of that, because they all got variances. So the district court here did vary down, in part because I think the district court said was that the losses he thought, the district court thought, were potentially overstated relative to the culpability of the various defendants. Okay, thank you very much, Ms. Quinn. Mr. Wilkie, we went way over time with you, largely my fault. I'll give you a minute if there's anything you just want to wrap up real quick. I'll just be very brief, Your Honor. I disagree with the government's contention that there was cooperation and that the evidence was overwhelming. And I would note that with regard to Sod, Sod was the cooperation that the government relied on in closing. So Ms. Quinn argues that there was all this other evidence, but it was actually Sod's testimony that they did rely on. The only other point I would note is the aspect of the scheme that involved the making of false documents. The witness who implicated Obagi, Meher Obagi, in that was Mohamed El-Tahir. He, like Berchel, was substantially impeached. Spinella did not corroborate him because she could not say whether it was Aref Obagi or Meher Obagi. If you could just hold on one second. I think we may have lost Judge Bumate. There he's back. Yeah, I was talking about the government's argument about the collaboration and specifically this issue about the making of false documents aspects of the scheme. And the only witness who implicated Meher Obagi in that was Mohamed El-Tahir, who, like Berchel, was substantially impeached. Spinella, Shauna Spinella, did not corroborate that because she admitted that she wasn't certain whether it was Aref Obagi or Meher Obagi, who on one occasion she saw having some involvement with this false engagement documents. And as Judge Owens pointed out, Joyce Armstrong, the accountant for the company, testified that she had no idea that there was fraudulent activity going on in the company and therefore could not speak as to whether Meher Obagi knowingly participated in the fraud. The evidence was not overwhelming, and each of the major points of evidence that the government is relying on are tainted by the three issues that we've identified in our brief. I didn't get to discuss the second issue, but that goes directly to what Mr. Obagi's lack of participation in the document falsification portion of the scheme, where he makes this what he was doing. So those arguments are laid out in the brief, and I would submit on that. But each of the points on which the government seems to base this case is all undermined by the three issues that we've identified here. And for that, I would submit my client did not receive a fair trial, believing that a fair trial was necessary. All right. Thank you very much, Mr. Wilkie. Mr. Stewart, you have some time. Mr. Stewart, you need to go off mute. I'm. No, I can hear me are we can. Okay, good. I just want to leave you with the words of the prosecution. The day after all of this blew up, which was on a reporter's transcript 325 15 at page eight. Prosecution told the court Sod's testimony went right to the heart of what was happening at Excel during the relevant events set forth in the indictment. I couldn't put that better myself, Your Honor. And thank you. All right. Thanks, Stewart. Mr. Coleman, I can give you a minute. Thank you, Your Honor. I just wanted to discuss the loss issue first on the whether plain error applies or not. The government has said that the defense and they've used that term broadly disavowed the argument that's being made on appeal. But Mr. Obagi did not. They continue to refer to a comment that was made by Mr. Wilkie actually for his client. But my trial counsel below for Mr. Obagi did not disavow this argument. Best case scenario for the government, they're now saying, well, if we lose on plain error, it should be clear error. This court in Gasca Ruiz, which is the in-bank case from a few years ago, has done away with this clear error idea. At best case scenario for the government, the standards of use of discretion, because this involves it's a misquestion of law and fact. The legal issue here is that I think as the government continues to concede is that contrary to application note three, the loss amount includes interest and other fees that should not have been included. And when you back out those numbers, you come out below the $9.5 million threshold. Judge Malloy pointed out that the leader of the conspiracy, the government agreed, was less than $9.5 million. These defendants should get the same benefit. And finally, the government had mentioned that the district court had varied. The district court varied only one level as to Mr. Obagi. The difference here would be at least two levels. So the variance that he did get does not offset the increase in loss that he received. So I don't think that argument, I don't think the variance argument matters at all. But even if it did, he didn't get the same benefit as if he didn't get the plus one. And if there are no other questions, I'd submit. No, thank you very much, Mr. Coleman. I want to thank all counsel in this case. It's nice to have experienced professional counsel in the case of this many issues. You guys really got to the heart of the case. And I really appreciate that for all four of you. Sorry we didn't get to see him, Mr. Stewart, but it was good hearing your voice. Next time, Your Honor, I promise. All right. And with that, this case is submitted. And this particular panel is adjourned. Thank you all. Thank you, Your Honor. All rise. This court for this session stands adjourned.
judges: Owens, Bumatay, Molloy